# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1828-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

L.H.,

      Defendant-Appellant,

and

C.H.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF K.L.H.
and S.G.H.,

      Minors.

_____

      Argued December 17, 2018 – Decided January 23, 2019

      Before Judges Messano and Rose.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0171-17.

Clara S. Licata, Designated Counsel, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Clara S. Licata, on the briefs).

Joseph A. Becht, Jr., Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason W. Rockwell, Assistant Attorney General, of counsel; Joseph A. Becht, Jr., on the brief).

Danielle Ruiz, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith A. Pollock, Deputy Public Defender, of counsel; Danielle Ruiz, on the brief).

PER CURIAM

The Family Part's November 30, 2017 judgment of guardianship terminated the parental rights of defendant L.H. to her daughters, K.L.H. (Karen), born in 2001, and S.G.H. (Sara), born in 2005.[1] Defendant argues the Division of Child Placement and Permanency (the Division) failed to prove all four prongs of the statutory best-interests-of-the-child test by clear and

---

[1] We use pseudonyms to maintain the confidentiality of the parties and the children.

convincing evidence. See N.J.S.A. 30:4C-15.1(a). The Division and the children's Law Guardian urge us to affirm the judgment.[2]

I.

The Division became involved with the family in 2003, when a substantiated finding of neglect was entered against Charles, and, later, in 2010, when the Division substantiated an allegation of neglect against defendant. The events leading up to termination, however, occurred in October 2014, when Sara's school made a referral to the Division because she was absent thirteen out of eighteen school days that month. The Division investigated but made no finding and closed its file.

In February 2015, the school made another referral, claiming defendant refused to cooperate with Sara's home instruction program. The Division's investigation revealed defendant would not let the instructor enter her home, nor would she permit the instructor to teach Sara at a nearby school or library. A psychological evaluation of Sara concluded the child likely would not return to school "in the near future" because of "severe, and enduring stressors in her life," including defendant's behavior.

---

[2] The judgment also terminated the parental rights of C.H. (Charles), defendant's husband and the children's father. He has not appealed.

In April, the school made another referral. Sara had not attended for nearly two months, and Karen missed thirty-four days of school during the prior four months. When interviewed, Karen stated that defendant made her stay home because defendant did not want to be home alone. The Division commenced a Title Nine protective services action on April 23, 2015. Defendant and Charles retained custody of the children, but the court ordered them to ensure Sara's and Karen's attendance at school, and to undergo psychological evaluation. The doctor diagnosed defendant with a delusional disorder and unspecified anxiety disorder. A psychiatric evaluation in May suggested defendant suffered from an underlying mental illness consistent with a psychotic disorder.

The Division effected an emergency removal on April 30, when it learned that the children had not attended school as ordered by the court. Contemporaneously, defendant and Charles were evicted from their apartment and moved in with Charles' mother in her one-bedroom unit. The Division anticipated reunification if defendant and Charles continued recommended treatment for their diagnosed psychological conditions, including attendance at counseling arranged by the Division.

However, the Division's plan changed to termination in January 2017, a decision driven by several intervening events. Defendant stopped attending counseling and was terminated from the program in June 2016. Sara, who was living with resource parents, was diagnosed with schizophrenia. In November 2016, defendant was hospitalized and treated for manifestations of "schizophrenia . . . and other psychotic disorder."

In the months leading up to trial, defendant and Charles attended psychological counseling together, but, in June 2017, their therapist recommended termination based on the lack of any progress and the couple's failure to address common problems in the home. In August, defendant suffered a psychotic episode that incapacitated her and required further hospitalization.

The children's resource parent had difficulty caring for the girls, and in August 2017, the Division removed them and placed them with new resource parents. The judge interviewed Karen and Sara in chambers before trial. They reported being "comfortable" living with those resource parents and "interested in being adopted."

The guardianship trial commenced in October 2017, and the Division's caseworker authenticated the voluminous agency records and testified about her interactions with the family. The Division's expert, Dr. Mark Singer, who had

A-1828-17T4

conducted psychological evaluations of defendant and Charles, and bonding evaluations between them and the children, and the children and their original resource parent, also testified. Neither defendant nor Charles testified, and neither called any witnesses.

On November 30, 2017, following an oral decision on the record and the filing of a written decision as well, the judge entered the judgment of guardianship. This appeal followed.

## II.

"We will not disturb the . . . decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). We accord even greater deference "[b]ecause of the family courts' special jurisdiction and expertise in family matters . . . ." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." E.P., 196 N.J. at 104 (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596,

605 (2007)).  However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference."  N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552-53 (2014) (quoting Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"The focus of a termination-of-parental-rights hearing is the best interests of the child."  N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 447 (2012) (citing N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 110 (2011)).  The four statutory prongs "are neither discrete nor separate.  They overlap to provide a composite picture of what may be necessary to advance the best interests of the children."  N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 280 (emphasis in original) (quoting N.J. Div. of Youth & Family Servs. v. F.M., 375 N.J. Super. 235, 258 (App. Div. 2005)).

A.

Under prong one, the Division must prove by clear and convincing evidence that "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]"  N.J.S.A. 30:4C-15.1(a)(1).  Although the Division need not "wait 'until a child is actually irreparably impaired by parental inattention or neglect[,]'" F.M., 211 N.J. at 449

(quoting In re Guardianship of D.M.H., 161 N.J. 365, 383), it "must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" N.J. Div. of Youth & Family Servs. v. A.L., 213 N.J. 1, 25 (2013) (quoting In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)).

Defendant contends that the judge relied upon evidence from the Title Nine proceeding, where the lesser preponderance-of-the-evidence standard applied, and the prior administrative substantiation of neglect based upon inadequate supervision of the children, to conclude the Division proved prong one by clear and convincing evidence. See, e.g., R.D., 207 N.J. at 118-19 (holding that in general, Title Nine findings may not be given preclusive effect in subsequent Title Thirty litigation). Defendant misconstrues the basis of the judge's findings as to prong one.

The judge found the Division's witnesses to be credible. He set forth the circumstances of the 2010 investigation that substantiated defendant for neglect, and the 2015 removal, by citing to evidence in the Division's records. The Division's caseworker testified regarding the removal and the investigation that followed. We fundamentally disagree, therefore, with defendant's assertion that whether she inadequately supervised her children or educationally neglected them "was not litigated" in the guardianship trial.

The judge cited the "unrefuted expert testimony" that defendant and Charles placed the children at continued risk of harm because they failed to treat their own mental health problems, were unable to respond to their daughters' demands, and unable to address their housing issues. The judge referred to Dr. Singer's testimony that Karen "adopted a somewhat parentified role" with respect to defendant and Charles, and understood her parents "cannot care for her." In short, the evidence found by the judge was sufficient to prove prong one.

B.

Defendant presents a somewhat synergistic argument regarding the insufficiency of the Division's evidence as to prongs two and three, which required the Division to prove by clear and convincing evidence,

> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights[.]

A-1828-17T4

[N.J.S.A. 30:4C-15.1(a)(2) and (3).]

The prong two "inquiry centers on whether the parent is able to remove the danger facing the child," and may "also be satisfied if 'the child will suffer substantially from a lack of . . . a permanent placement and from the disruption of [the] bond with foster parents.'" F.M., 211 N.J. at 451 (alteration in original) (quoting K.H.O., 161 N.J. at 352, 363).

"The emphasis [in prong three] is on the steps taken by [the Division] toward the goal of reunification." Id. at 452 (citing K.H.O., 161 N.J. at 354). "'Reasonable efforts' may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." M.M., 189 N.J. at 281 (citing N.J.S.A. 30:4C-15.1(c)). However, "[e]xperience tells us that even [the Division's] best efforts may not be sufficient to salvage a parental relationship." F.M., 211 N.J. at 452.

Defendant does not minimize the seriousness of her mental illness. The judge found defendant and Charles both suffered from serious mental health issues. The judge also noted that defendant "may suffer another psychotic disorder compromising her ability to function in reality and placing her children at risk." That finding is clearly supported by the evidence in the record.

The judge also concluded defendant and Charles lacked insight into their "children's unique mental health issues," making them unable to assist Karen and Sara. In addition, the judge found defendant and Charles failed to address their lack of adequate housing, noting that throughout the litigation, they remained living in a one-bedroom apartment, clearly inadequate if the family were reunited.

Based on Dr. Singer's testimony, the judge found that Karen and Sara would suffer additional harm by the delay in permanent placement, even if their current resource parents were unwilling to adopt them, because the children "are aware that their parents cannot care for them." Lastly, the judge reviewed the various services the Division provided after removal and concluded prong three was proven by clear and convincing evidence.

Defendant argues the Division failed to prove she was unable to remediate the harm, noting that because of her mental illness, defendant was "incapable of understanding . . . her actions harmed or presented a risk of harm" to the children, and the "cookie-cutter therapeutic services" offered by the Division failed to address defendant's mental illness. As to the second portion of prong two, defendant contends there was no evidence "that separating [Karen] and

[Sara] from their foster parents would result in severe and enduring harm to them."

We acknowledge "[m]ental illness, alone, does not disqualify a parent from raising a child. But it is a different matter if a parent refuses to treat h[er] mental illness, [or] the mental illness poses a real threat to a child . . . ." Id. at 450-51. We have repeatedly recognized that termination is appropriate when a parent, neither "morally culpable [n]or blameworthy," is unable to parent because of mental illness. N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 439 (App. Div. 2001); see also In re Guardianship of R., G. and F., 155 N.J. Super. 186, 194 (App. Div. 1977).

We also agree with the judge that even though the current resource family was unwilling to adopt Karen and Sara, the "delay of permanent placement will add to the harm" they already suffered. N.J.S.A. 30:4C-15.1(a)(2). As we see it, contrary to defendant's assertion, this conclusion is not inconsistent with the judge's finding, under prong four, that the children would not suffer enduring harm if separated from the current resource family.

Finally, we acknowledge the exquisitely difficult task faced by the Division in trying to tailor services, particularly in the field of mental health, to a particular parent. The record demonstrates that the Division provided some

A-1828-17T4

counseling services to defendant without success. Whether the actual counseling provided addressed defendant's specific mental illness is certainly debatable. However, Dr. Singer opined that defendant would not be able to parent her children in the reasonably foreseeable future, regardless of the amount and nature of the services provided.

We have said that "[e]ven if the Division ha[s] been deficient in the services offered[,]" reversal is not necessarily "warranted, because the best interests of the child controls[]" the court's ultimate decision. N.J. Div. of Youth & Family Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007). We therefore reject defendant's challenge to the judge's determination regarding prongs two and three.

C.

Under the fourth prong, the Division must prove "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). It "serves as a fail-safe against termination even where the remaining standards have been met." G.L., 191 N.J. at 609. "The question ultimately is not whether a biological mother or father is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." E.P., 196 N.J. at 108. Typically, "the [Division] should offer testimony of a

well-qualified expert who has had full opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with both the natural parents and the foster parents." F.M., 211 N.J. at 453 (quoting M.M., 189 N.J. at 281).

The judge relied upon Dr. Singer's opinion that neither defendant nor Charles would be able to parent Karen and Sara in the foreseeable future. After the girls were relocated to another resource home, Dr. Singer provided an update of his earlier report and opined that termination was still preferable.

Defendant's essential argument is that Dr. Singer's testimony was equivocal and insufficient to prove prong four. Originally, Dr. Singer concluded the children had formed a significant bond with their first foster family and severing that bond would cause significant harm. He also noted termination of defendant's parental relationship would negatively affect Karen and Sara. However, because the children had only been with their new resource parents for two months, Dr. Singer was unable to perform an updated bonding evaluation, and the Division knew the resource parents did not wish to adopt the children.

Certainly, "courts have recognized that terminating parental rights without any compensating benefit, such as adoption, may do great harm to a child." E.P.,

196 N.J. at 109 (citing <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 610-11 (1986)). However, the testimony of the Division's caseworker expressed optimism that Karen and Sara would be adopted once defendant's parental rights were terminated. In evaluating the fourth prong proofs, "an important consideration is '[a] child's need for permanency.'" <u>F.M.</u>, 211 N.J. at 453 (alteration in original) (quoting <u>M.M.</u>, 189 N.J. at 281). "Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." <u>A.G.</u>, 344 N.J. Super. at 438.

Here, the judge credited Dr. Singer's bottom-line conclusion, that termination and interim placement with potential adoption would not do more harm than good given the unlikely prospects that defendant would ever be capable of effective parenting. The judge credited that opinion, and we find no basis to disturb that conclusion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1828-17T4